Filed 1/22/24

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>CHRISTIAN STEVE CAMPOS,<br><br>     Defendant and Appellant. | F084307<br><br>(Kern Super. Ct. No. BF176523A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Randall Conner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench, and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant and appellant Christian Steve Campos (defendant) contends electronic information evidence introduced in his murder trial should have been suppressed because he was not properly notified of its acquisition by the government pursuant to the California Electronic Communications Privacy Act (Pen. Code, § 1546 et seq.;

CalECPA).[1]  We agree that the government did not properly notify defendant pursuant to the CalECPA but conclude that suppression is nonetheless unwarranted.  We also reject a claim of ineffective assistance of counsel and affirm the judgment.

**BACKGROUND**

In an amended information filed March 28, 2022, the Kern County District Attorney charged defendant with premeditated murder (§ 187, subd. (a).)  The information further alleged defendant discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), personally used a firearm (§ 12022.5, subd. (a)), committed a crime involving great violence, bodily harm, etc. (Cal. Rules of Court, rule 4.421(a)(1)), was armed with or used a weapon at the time of the crime (rule 4.421(a)(2)), committed a crime upon a vulnerable victim (rule 4.421(a)(3)), committed the crime in a way that indicates planning, sophistication or professionalism (rule 4.421(a)(8)), took advantage of a position of trust or confidence (rule 4.421(a)(11)), and engaged in violent conduct indicating a serious danger to society (rule 4.421(b)(1).)

A jury acquitted defendant of first degree murder but convicted him of second degree murder.  The jury also found the gun enhancements under section 12022.5, subdivision (a) and section 12022.53, subdivision (d) to be true.

The prosecutor dismissed the aggravating factor allegations regarding particularly vulnerable victims and taking advantage of a position of trust.  The jury found true the remaining aggravating factors.

The court sentenced defendant to 15 years to life for the second degree murder conviction, plus 25 years to life for the gun enhancement under section 12022.53, subdivision (d),[2] plus a stayed (Cal. Rules of Court, rule 4.447) term of 10 years for the gun enhancement under section 12022.5, subdivision (a).

---

[1] All further undesignated statutory references are to the Penal Code unless otherwise noted.

[2] The reporter's transcript omits the "3" in the code section.

2.

## FACTS

Just after midnight on April 14, 2019, Detective Lance O'Nesky responded to a McDonald's near the Vallarta Market on the southwest corner of Panama Lane and South H Street in Bakersfield. Earlier in the night, a man operating a street sweeper named Mark W. heard gunshots and flashes. He looked up and saw a two-tone Dodge Ram speed off. A bullet-ridden vehicle with the dead body of Daniel Macias (Macias) inside was found at the scene, along with sixteen .223-caliber casings. Macias's body had sandwich bags of marijuana on his lap and cash was scattered throughout his vehicle, which led police to believe Macias was engaged in the sale of narcotics.

Cell phone records indicated defendant's phone connected to a cell tower on South H Street, south of Panama Lane, for two calls during the 8:00 p.m. hour on April 13, 2019.

Defendant's brother-in-law, Jesus M., testified defendant came to his home on Price Street around midnight one night. Jesus's home is about two miles away from where the killing occurred. Defendant was intoxicated and his truck had been parked two blocks away. The next morning, Jesus drove defendant to his truck, which was the same one Mark W. had seen speeding away from the scene of the shooting.

There was a search for "Daniel Jeremy Macias" (the victim's name) on defendant's Facebook account on April 15. An account named "Praymontes Smokes" sent defendant a news release discussing Macias's killing via Facebook. Defendant then sent a message saying, "Only talk bout it in person or phone."

The Facebook records also indicated defendant was attempting to sell an "AR." Defendant said, "I need it gone ASAP." Later defendant said, "I'm just trinna get rid of that ASAP before they start coming for me. My truck all over the news." AR-15 rifles are capable of firing .223-caliber ammunition.

On April 18, defendant said on Facebook, "I know g we need a whip I'm already ganna f[**]king time hella time if I'm bouta get a death sentence n[**]ga."

3.

In the days following the killing, an internet search for results concerning the murder in southwest Bakersfield was made on defendant's cell phone.

On April 26, police stopped defendant while he was driving the two-tone Dodge Ram truck that had fled the scene. Defendant said he normally drives his vehicle and that he was "the only person to drive it." Defendant was arrested.

Defendant denied committing the murder, claimed the cell phone found in his truck belonged to someone else, claimed his cell phone number was one digit different from what it actually was, initially denied being in Bakersfield on April 13, denied being to the area of the Vallarta Supermarket in the last year, claimed to have not been to his brother-in-law's address on Price Street for three months, and denied having a Facebook account.

One hour and 44 minutes after defendant was booked into jail, he had a phone call with a woman whose phone number was attributed to Jen T., the mother of defendant's child. Immediately upon connection of the call, the following exchange occurs:

"FEMALE: Hello?

"DEFENDANT: (unintelligible)

"FEMALE: Oh my God.

"DEFENDANT: I know, huh? Crazy.

"FEMALE: Huh!?

"DEFENDANT: I'm already inside of here, Boo.

"FEMALE: Did you do it?!

"DEFENDANT: Yeah. Don't say anything … on the phone …

"FEMALE: Christian, not even after you f[**]king daughter you changed! Why?!

"DEFENDANT: I don't know, man.

"FEMALE: Why would you, Christian?!

4.

"DEFENDANT:    I don't know, Boo.  They got me hella f[**]ked up.  Can I talk to you for a bit?

"FEMALE:   Why would you do something like that?

"DEFENDANT:    Don't say it on the phone, they record everything…."

Later in the call defendant said, "I wasn't even ready to lay him out that day though n[**]ga, I was hella drunk that day so, they got me f[**]ked up.  You know?"

**Defense Evidence**

*A.A.*

Defendant introduced evidence seeking to implicate another man, A.A., for the murder. A.A.'s sister testified that A.A. had a "problem with drugs" and that he used Xanax.  When he used Xanax, he had a short temper.  A.A.'s sister testified that A.A. had been picked up by a Ram truck in the weeks before the shooting.  However, when showed the Ram truck identified in a police department press release as the suspect vehicle, she said it was different.[3]

Videos depicting an AR-15 rifle were posted to A.A.'s Snapchat account.  In the days preceding his death, Macias told his mother A.A. had threatened him.

A.A. is more heavyset than defendant.  A.A. has a "fade" haircut.

*Fabian M.*

An individual named Fabian M. testified that he had an argument with his father on April 13, 2019, and left his house as a result.  At around 11:00 p.m., he was near the McDonald's at South H Street and Panama Lane.  He saw a "guy" come out of a truck and shoot at a car.  Fabian heard a red-haired woman asking for help and crying.  The shooter was tall and had a "fade" haircut.  Fabian said the firearm used was fully automatic, rather than semiautomatic.  In Fabian's interview with police, he said "the guy" was Hispanic, around 18 to 20 years of age, and "pretty fat."

---

[3] A police sergeant testified A.A.'s sister told him that the press release *did* depict the Ram truck in which A.A. had previously been picked up.

5.

Fabian was shown a photographic lineup that did not include defendant but did include A.A. Fabian circled a person he believed might have been involved in the incident. The person Fabian circled was not A.A. or defendant. However, Fabian later testified he was too far away to see the person's face. When asked why he circled someone if he was too far away to see, he testified, "To be honest, sir, I don't know." Fabian testified he felt like he was supposed to pick somebody.

L.V. testified that that she witnessed the shooting as well. She did not see the shooter but did see "the truck."[4] L.V. initially testified the truck was "grayish-bluish, kind of greenish." When asked if she recalled telling police officers the truck was green, she testified, "Kind of." She then followed up by saying, "I know it was one of those three colors though." Finally, she said it was like a teal that could be called either green or blue.

**Rebuttal Evidence**

The prosecution introduced videos from Snapchat dated March 22, 2019, that depicted A.A. and Macias. The two were interacting in a friendly manner.

## DISCUSSION

I. **Government's Failure to Provide Proper Notice Under CalECPA Does Not Warrant Suppression**

*Background*

Defendant challenges the court's denial of his motion to void warrants issued before trial and suppress the electronic information obtained thereby. We will provide additional factual background pertinent to this claim.

**Warrant A**

Detective Aleman sought a search warrant for the Facebook account information of defendant and Alexis F. According to the affidavit, a photograph of Alexis F. matched

---

[4] While the testimony is confusing, it seems the witness was referring to the truck in which the shooter arrived and/or fired from.

6.

the description of a female who allegedly accompanied the shooter at the time of the homicide.

**Warrant B**

Detective Aleman sought another warrant for T-Mobile / MetroPCS records pertaining to the telephone number (xxx) xxx-5188, which belonged to defendant.

**Warrant C**

Detective Aleman sought another warrant concerning a Facebook account registered to a "Praymontes Smokes."

**Warrant D**

Detective Aleman sought a fourth warrant, apparently seeking records for the Facebook account of a Jaime Moreno.

The parties agree that, as to each warrant, law enforcement sought and obtained a 90-day extension of the notice period pursuant to section 1546.2, subdivision (b)(1), discussed further below.

**Defendant's Motion**

On July 27, 2021, defendant filed a motion pursuant to CalECPA (§ 1546 et. seq.) and the Fourth Amendment to void warrants A through D and to suppress the evidence obtained thereunder. The motion further alleged that the affidavit supporting warrant D only provided cause to obtain records of Alexis F. and defendant, even though the warrant was seeking records of Jaime Moreno.

The prosecution opposed the motion, arguing that the fruit of the poisonous tree doctrine does not apply, that Facebook notifies all users of government-compelled information in compliance with CalECPA, and that the police report and discovery provided by the prosecution in the case was sufficient notice.

An evidentiary hearing was held, at which Detective Aleman testified. Aleman sought a "delay of notice" so that the target of the warrant would not be notified "to avoid tipping off any potential suspects" being investigated.

Before the present warrants, Detective Aleman had completed around 10 warrants pertaining to Facebook records in his career. Once Facebook receives the warrant request, "they send you an email that says they have received your notice of delay and just giving you a heads-up … that – when that expires, they are going to notify the person." Aleman relies on Facebook's representation that they will notify the person. In Aleman's opinion, Facebook is in a better position to notify the holder of the account than Aleman is, at least when the person is not in custody. If the person is in custody, then Aleman would be in the better position to reach them.

Detective Aleman had also worked on T-Mobile/Metro PCS warrants in the past. T-Mobile/Metro PCS would tell Aleman that they would be providing notice at the end of the 90 days. Aleman would rely on the notice provided by T-Mobile/Metro PCS.

Detective Aleman did not follow up with Facebook or T-Mobile to verify that they had in fact delivered notice. Facebook did not inform Aleman as to how they would deliver notice.

In Detective Aleman's training and experience, once someone is arrested for a crime, they are provided details through the police report. Aleman relies on that as one of the methods of notice of "what came out during the investigation."

Defendant was arrested before the 90-day delay period expired. Defendant was in custody and had not bailed out. Inmates do not have access to their Facebook account or e-mail. When asked if he provided information to Facebook or T-Mobile on how to contact defendant in custody, Detective Aleman said he had not, and he apologized "regarding that."

### Fred Torres

Then-detective Fred Torres interviewed defendant. Torres told defendant he had received records that showed where he was on the date and time of the shooting. Torres told defendant he had looked at private messages leading up to or after the date of the shooting. When asked about what specifically he told defendant on those two subjects,

8.

Torres testified, "It was very limited information I have or did tell him." Torres could not remember exactly what Facebook information he shared with defendant during the interview.

Defendant was arrested within a week of the interview.

### Stipulation

The parties stipulated that "initial discovery" was provided to defense counsel before the 90-day notice delay expired.

### Court's Ruling

The court ruled as follows,

> "Okay. Between the reliance on the providers, the interview, and the information contained in the discovery, putting all of those together, and taking into account the circumstances that he was in custody, and that the affidavit and the warrants were sealed, taking all of that together, I'm going to find that the notice was sufficient."[5]

### *Law*

"Prior to passage of CalECPA, California law did not require law enforcement officials to obtain a warrant to access most electronic information. Proponents of CalECPA sought to update the law for 'the digital age' and 'properly safeguard the robust constitutional privacy and free speech rights of Californians, spur innovation, and support public safety by instituting clear warrant standards for government access to electronic information.' (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 178 (2015–2016 Reg. Sess.) as amended Mar. 16, 2015; see also Freiwald, *At the Privacy Vanguard: California's Electronic Communications Privacy Act* (*CalECPA*) (2018) 33 Berkeley Tech. L.J. 131, 143–147.)" (*People v. Meza* (2023) 90 Cal.App.5th 520, 545, fn. 15.)

---

**5** Defendant challenged this ruling by writ petition to this court. We denied the writ on December 28, 2021. We grant the Attorney General's unopposed request to take judicial notice of our records in that case.

9.

*Substantive Provisions*

Under CalECPA, the government may only compel the production of electronic communication information from a service provider by the means described in section 1546.1.  (§ 1546.1, subd. (a)(1).)  One permissible means is a standard search warrant, so long as it complies with subdivision (d) of section 1546.1.  (§ 1546.1, subd. (b)(1).)

Section 1546.1, subdivision (d) requires that the warrant describe with particularity the information to be seized "by specifying, as appropriate and reasonable, the time periods covered, the target individuals or accounts, the applications or services covered, and the types of information sought …."[6]  (§ 1546.1, subd. (d)(1).)  It further requires that the warrant prohibit, with limited exceptions, further review or disclosure of information obtained thereunder that is "unrelated to the objective of the warrant …." (*Id.*, subd. (d)(2).)  Finally, subdivision (d) requires that the warrant be accompanied by an order directing the service provider to produce an affidavit verifying the authenticity of the electronic information.  (*Id.*, subd. (d)(3).)

*Notice Requirements*

In addition to its substantive restrictions concerning how electronic information may be obtained by the government, CalECPA also contains provisions concerning notice.

With some qualifications, the "government entity that executes a warrant, or obtains electronic information in an emergency pursuant to Section 1546.1, shall serve upon, or deliver by registered or first-class mail, electronic mail, or other means reasonably calculated to be effective, the identified targets of the warrant or emergency access, a notice that informs the recipient that information about the recipient has been compelled or obtained, and states with reasonable specificity the nature of the

---

[6] In some circumstances, the court may determine the warrant need not specify time periods.  (§ 1546.1, subd. (d)(1).)

government investigation under which the information is sought. The notice shall include a copy of the warrant or a written statement setting forth facts giving rise to the emergency. The notice shall be provided contemporaneously with the execution of a warrant, or, in the case of an emergency, within three court days after obtaining the electronic information." (§ 1546.2, subd. (a)(1).)

"When a warrant is sought or electronic information is obtained in an emergency under Section 1546.1, the government entity may submit a request supported by a sworn affidavit for an order delaying notification and prohibiting any party providing information from notifying any other party that information has been sought. The court shall issue the order if the court determines that there is reason to believe that notification may have an adverse result, but only for the period of time that the court finds there is reason to believe that the notification may have that adverse result, and not to exceed 90 days." (§ 1546.2, subd. (b)(1).)

"Upon expiration of the period of delay of the notification, the government entity shall serve upon, or deliver to by registered or first-class mail, electronic mail, or other means reasonably calculated to be effective as specified by the court issuing the order authorizing delayed notification, the identified targets of the warrant or emergency access, a document that includes the information described in subdivision (a), a copy of all electronic information obtained or a summary of that information, including, at a minimum, the number and types of records disclosed, the date and time when the earliest and latest records were created, and a statement of the grounds for the court's determination to grant a delay in notifying the individual." (§ 1546.2, subd. (b)(3).)

### Suppression Provision

Finally, the CalECPA contains a suppression provision, stating:

> "Any person in a trial, hearing, or proceeding may move to suppress any electronic information obtained or retained in violation of the Fourth Amendment to the United States Constitution or of this chapter. The motion shall be made, determined, and be subject to review in accordance

with the procedures set forth in subdivisions (b) to (q), inclusive, of Section 1538.5." (§ 1546.4, subd. (a).)

*Analysis*

First, defendant contends the court erred in concluding the purported "notice" in this case was sufficient under CalECPA.[7] We agree.

Section 1546.2, subdivision (b)(3) establishes several requirements for notice under CalECPA. It specifies (1) who must send the notice, (2) how notice is to be transmitted, (3) the recipient of the notice, and (4) the contents of the notice.

**Sender**

Relevant here, the notice must come from the government, not the service provider. The statute is quite clear in this regard, providing that "*the government entity shall* serve …" notice. (§ 1546.2, subd. (b)(3); see also *id.*, subd. (a)(1) [the "government entity that executes [the] warrant, or obtains electronic information in an emergency … shall serve …"].)

**Means**

The statute identifies the means by which notice must be transmitted: "the government entity shall *serve upon, or deliver to by registered or first-class mail, electronic mail, or other means reasonably calculated to be effective* …" notice. (§ 1546.2, subd. (b)(3); see also *id.*, subd. (a)(1).)

**Recipient**

The notice must be transmitted to "the identified targets of the warrant or emergency access." (§ 1546.2, subd. (b)(3); see also *id.*, subd. (a)(1).)

---

[7] The Attorney General contends that defendant is not entitled to relief as to Warrants C and D because he was not the targeted accountholder addressed in those warrants. However, defendant was the targeted accountholder in Warrants A and B, so we must address those claims regardless. Because we ultimately conclude the notice violations do not warrant reversal (or suppression) even as to Warrants A and B, we reject all of defendant's claims and do not address this argument from the Attorney General further.

12.

**Contents**

The notice must include "the information described in [section 1546.2,] subdivision (a), a copy of all electronic information obtained or a summary of that information, including, at a minimum, the number and types of records disclosed, the date and time when the earliest and latest records were created, and a statement of the grounds for the court's determination to grant a delay in notifying the individual." (§ 1546.2, subd. (b)(3).)

**Notice was Insufficient Under CalECPA**

The Attorney General argues that notice was sufficient here for the reasons asserted by the prosecution and accepted by the trial court. We disagree.

First, as noted above, notice must be given by the government, not the service providers. Information provided to the accountholder by Facebook or T-Mobile does not satisfy the government's responsibility under section 1546.2. The police department's reliance on providers to give notice under section 1546.2 was therefore improper.

Second, notice was required to include "a copy of all electronic information obtained or a summary of that information, including, at a minimum, the number and types of records disclosed, the date and time when the earliest and latest records were created, and a statement of the grounds for the court's determination to grant a delay in notifying the individual." (§ 1546.2, subd. (b)(3).) The Attorney General suggests that providing the police report and mentioning information during defendant's interrogation was sufficient. However, the interrogating officer testified he could not recall exactly what Facebook information he relayed to defendant, and, in any event, it was "very limited information." In no way does this satisfy the notice content requirements of section 1546.2.

13.

**Consequence of Insufficient Notice**

Having determined that the government failed to comply with the notice provisions of CalECPA, we must determine whether the evidence obtained under the warrants must be suppressed.

"Any person in a trial, hearing, or proceeding may move to suppress any electronic information obtained or retained in violation of the Fourth Amendment to the United States Constitution or of this chapter. The motion shall be made, determined, and be subject to review in accordance with the procedures set forth in subdivisions (b) to (q), inclusive, of Section 1538.5." (§ 1546.4, subd. (a).)

Subdivision (n) of section 1538.5 provides: "This section establishes only the procedure for suppression of evidence and return of property, and does not establish or alter any substantive ground for suppression of evidence or return of property."

Section 1546.4, subdivision (a) provides that a person "may move to suppress" electronic information obtained or retained in violation of the Fourth Amendment *or* the CalECPA. It is important to note that the literal language of this provision authorizes the filing of a suppression motion but does not expressly mandate that *all* electronic information obtained or retained in violation of the CalECPA must *always* be suppressed. (See *Price v. Superior Court* (2023) 93 Cal.App.5th 13, 58.)

This literal reading is buttressed by the statute's provision that the motion shall be "determined" in accordance with the procedures set forth in subdivisions (b) through (q) of section 1538.5, which includes the following provision: "This section establishes only the procedure for suppression of evidence … and does not establish or alter any substantive ground for suppression of evidence …." (§ 1538.5, subd. (n).)

Furthermore, this interpretation is further supported by the statute's legislative history. As introduced on February 9, 2015, Senate Bill No. 178 would have created section 1546.4, subdivision (a) to read, in pertinent part, "no evidence obtained or

14.

retained in violation of this chapter shall be admissible in a criminal … proceeding .…" (Sen. Bill No. 178 (2015–2016 Reg. Sess).)

According to a report from the Assembly Committee on Public Safety, the California State Sheriffs' Association opposed the bill on multiple grounds, including the following: " '[W]e are concerned about the breadth of the exclusionary provisions of proposed section 1546.4. Whether evidence should be admitted or not should be based on a motion to suppress under … section 1538.5 and should be based on violations of the Fourth Amendment. Technical violations of the "chapter" that do not implicate a person's right to privacy should not result in the suppression of evidence.' " (Assem. Com. on Public Safety, Rep. on Sen. Bill No. 178 (2015–2016 Reg. Sess.) July 7, 2015, p. 12.)

On August 17, 2015, Senate Bill No. 178 was amended to delete the previous text of section 1546.4, subdivision (a) and replace it with the following: "(a) Any person in a trial, hearing, or proceeding may move to suppress any electronic information obtained or retained in violation of the Fourth Amendment to the United States Constitution or of this chapter. The motion shall be made, determined, and be subject to review in accordance with the procedures set forth in subdivisions (b) to (q), inclusive, of Section 1538.5." (Assem. Amend. to Sen. Bill No. 178 (2015–2016 Reg. Sess.) Aug. 17, 2015.) This language remained in the bill when it passed, and is the current text of section 1546.4, subdivision (a).

By altering section 1546.4 in this fashion, the August 17, 2015, amendment evinces a rejection of the proposal to exclude *all* evidence obtained in violation of the CalECPA.

So, we are left with the fact that CalECPA provides for a motion to suppress evidence obtained in violation of its provisions but does not require suppression with all violations. This begs the question, when does CalECPA require suppression?

15.

An argument can be made that suppression is never appropriate when the only error is one of notice.[8]  The public has a profound interest in relevant evidence being admitted in prosecutions of crime.  (*People v. Superior Court (Sosa)* (1983) 145 Cal.App.3d 581, 588.)  When the government has properly obtained relevant evidence, and its only failure is timely notification under CalECPA, the consequence should not be categorical exclusion of such evidence unless the Legislature is exceedingly clear on the point.[9]  The interests of justice are not furthered by excluding truthful, relevant evidence needed to prosecute criminals.  Exclusion is simply too high a cost for courts to impose on a mere *post-disclosure* notice violation absent clear statutory direction.  To the extent the Legislature wanted a regime whereby suppression was required even when the violation solely pertained to notice, it would need to enact language akin to what was previously deleted from Senate Bill No. 178.

However, neither party makes that argument here.  Instead, both parties contend we should apply the framework developed by the Court of Appeal in *People v. Jackson* (2005) 129 Cal.App.4th 129.  Because we conclude below that suppression is not appropriate under the *Jackson* inquiry, we do not resolve whether suppression is ever the appropriate remedy for notice violations.

Adapting the *Jackson* framework to the present context, we would ask:  (1) Has defendant established a violation of CalECPA?  (2) If so, was the violated provision intended to play a central role in the statutory scheme?  And (3) if so, was the purpose of

---

[8] In contrast, violations of CalECPA's substantive limitations on how the government can acquire electronic information may often require suppression.  Such violations are analogous to the type of Fourth Amendment violations for which suppression is a common and longstanding remedy.  For example, it is not hard to imagine that if a police officer were to violate CalECPA by demanding under color of law that an objecting provider turn over electronic information – without a warrant, wiretap, order, subpoena, etc. (see § 1546.1, subd. (a)(1)) – such evidence would likely need to be suppressed.

[9] Except where the government's withholding has prejudiced the defendant's ability to defend himself at trial, which is already handled by discovery law.

the provision achieved in spite of the error?  (See *People v. Jackson*, *supra*, 129 Cal.App.4th at p. 149.)

We concluded above that defendant had established a violation of CalECPA's notice provisions.  And it is clear CalECPA's notice provisions play a central role in serving the overall purpose of CalECPA.  (See *Price v. Superior Court* (2023) 93 Cal.App.5th 13, 62.)

Consequently, we turn to the final *Jackson* question and ask whether CalECPA's purpose was achieved in spite of the notice error.  We conclude it was.  It is important to note that CalECPA's provisions for notice in emergency situations generally involve *post*-disclosure notice.  (See § 1546.2.)  Indeed, notice can be delayed for months at a time. (See § 1546.2, subd. (b)(1) & (2).)  This is not a situation where the law's purpose is *pre*-disclosure notice so that the target can *prohibit* the initial disclosure to law enforcement.

Here, law enforcement's efforts to seek electronic information was eventually made available to defendant through discovery, and the unsealing of the warrants.  Obviously, this is not the means of notice mandated by CalECPA.  However, we have already concluded CalECPA was violated and are now tasked with determining whether suppression is an appropriate remedy.  On that issue, the existence of a violation is not the question.  Rather, *Jackson* focuses on the fulfillment of the law's broader purpose in spite of the error.  And since law enforcement's efforts to obtain defendant's electronic information were eventually made known to him before trial began, we cannot say the violations defeated CalECPA's purpose.  Consequently, suppression is not appropriate under *Jackson*.

## II.      Defendant Has Not Established Ineffective Assistance of Counsel

Defense counsel did not request a *Franklin*[10] hearing.  Defendant claims the failure to request such a hearing constituted ineffective assistance of counsel.

---

[10] *People v. Franklin* (2016) 63 Cal.4th 261.

*Background*

On May 9, 2022, the probation officer's report was filed. The report reflected that defendant was 21 years old and that his date of birth was in November 2000. Defendant refused to provide certain information requested for the probation report.

At sentencing, defense counsel requested the court strike the firearm enhancement under section 12022, which the prosecution opposed. The prosecution also presented victim impact statements.

A statement from the victim's sister read at sentencing included the following passage:

> "Sadly, [defendant] and [the victim] had several things in common. They both grew up in extreme poverty and had enabling authority figures, which resulted in poor decisions and both of them were involved in criminal activity."

*Analysis*

Ineffective assistance of counsel claims should generally be pursued through habeas corpus proceedings. (*People v. Mai* (2013) 57 Cal.4th 986, 1009; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–268.) This is because on direct appeal, a court may find deficient performance only if: (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165; *Mai*, at p. 1009.) If counsel's tactics or strategic reasons for challenged decisions do not appear on the record, courts will not find ineffective assistance of counsel unless there could be no conceivable reason for counsel's acts or omissions. (*Johnsen*, at p. 1165). Given this framework, "[r]arely is ineffective assistance of counsel established on [direct] appeal since the record usually sheds no light on counsel's reasons for action or inaction." (*People v. Woodruff* (2018) 5 Cal.5th 697, 736.)

A *Franklin* hearing is a proceeding where the offender can assembly evidence at or near the time of the offense for the benefit of the parole board. (*In re Cook* (2019) 7 Cal.5th 439, 457, 459.) Defendants may choose to forgo a *Franklin* hearing because "[d]elving into the past is not always beneficial to a defendant." (*In re Cook*, at p. 459.)

Here, the record does not support a finding of ineffective assistance of counsel on direct appeal. Defense counsel's reason for not requesting a *Franklin* hearing could be one of several. While ineffective assistance is one possibility, another possibility is that defense counsel's research and evaluation led him to conclude that, on balance, "delving into the past" in a *Franklin* hearing would not be "beneficial" (*In re Cook*, *supra*, 7 Cal.5th at p. 459) to this particular defendant.[11] Because the record does not *affirmatively* establish ineffective assistance of counsel, we reject it on direct appeal.

**DISPOSITION**

The judgment is affirmed.

POOCHIGIAN, J.

WE CONCUR:

LEVY, Acting P. J.

DE SANTOS, J.

---

[11] Defendant observes that the record indicates some witnesses "might have provided more insight into appellant's upbringing, social issues and use of alcohol." But the record is silent as to whether defense counsel spoke to those witnesses. It is also silent as to whether defense counsel made a tactical conclusion that, in spite of those witnesses, a *Franklin* hearing would not have been beneficial to defendant on balance.